IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


LORETTA MORSE,                        )
                                      )
              Plaintiff,              )
                                      )
      v.                              )   No. 12 C 10263
                                      )
ILLINOIS DEPARTMENT OF                )
CORRECTIONS,                          )
                                      )
              Defendant.              )


MEMORANDUM OPINION AND ORDER

Loretta Morse ("Morse"), a former dental assistant at
Stateville prison, contends that the Illinois Department of
Corrections ("IDOC") discriminated and retaliated against her in
violation of the Age Discrimination in Employment Act of 1967
("ADEA"), 29 U.S.C. § 621 *et seq*.  For the reasons stated below,
I deny IDOC's motion for summary judgment on Morse's claims.

**I. Background**

At the summary judgment stage, I must view the evidence in
the light most favorable to Morse and draw all "justifiable
inferences" in her favor.  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 255 (1986).

Morse began her career with IDOC in 1993.  *See* Dkt. No. 58
("Pl.'s L.R. 56.1 Resp.") at ¶ 3.  At all relevant times, Morse
was a dental assistant at Stateville Correctional Center

1

("Stateville") and the physically adjacent Northern Reception and Classification Center ("NRC"). *Id*. at ¶¶ 1, 4.

The key figures in Morse's case include Marcus Hardy, the Warden of Stateville from December 2009 to December 2012; Patrick Keane, the Assistant Warden of Programs for the NRC from May 2011 to February 2012; Diane Wysocki, the Human Resources Representative at Stateville since 2002; Vickie Fair and Leslie McCarty, two employees in the Office of Affirmative Action; Royce Brown-Reed, the Healthcare Unit Administrator; and Ralph Portwood, the president of Morse's union. *Id*. at ¶¶ 6, 9, 15, 17-18, 26, 29. Morse's direct supervisor was Dr. Jacqueline Mitchell ("Dr. Mitchell"), IDOC's lead dentist at Stateville. *Id*. at ¶¶ 12-13. Morse also worked under the supervision of two contract dentists, Dr. Brooks and Dr. Thomas, employed by Wexford Health Sources, Inc. *Id*. at ¶¶ 11, 13, 19, 22.

## A. Morse's conflicts with Dr. Mitchell

On October 14, 2009, Morse filed a grievance alleging that Dr. Mitchell had called her "old and slow" and praised another dental assistant, Chris Luce, as "younger and faster." *Id*. at ¶ 20. Warden Hardy referred Morse's grievance to Internal Affairs for investigation. *Id*. IDOC and the union purported to resolve Morse's grievance in February 2010 by agreeing to follow the collective bargaining agreement provision concerning alleged harassment. *Id*. at ¶ 21.

Morse had another dispute with Dr. Mitchell about three to four months after the "old and slow" comment. In January 2010, Morse filed a grievance alleging that Dr. Mitchell had asked Ken Osborne, the Assistant Warden of Programs, to block Morse from taking a pre-approved holiday vacation. *Id.* at ¶ 23. Morse won the grievance, but says that it came at the cost of antagonizing Assistant Warden Osborne, who subjected her to greater scrutiny and threatened to fire her for her next mistake. *Id.* at ¶ 24.

Consistent with her fear of retaliation, Morse filed an Incident Report on March 18, 2010, in which she accused Assistant Warden Osborne and Dr. Mitchell of attempting to "sabotage" her performance review. *Id.* at ¶ 27; *see also* Pl.'s Dep. at Ex. 12. Assistant Warden Osborne allegedly instructed Royce Brown-Reed ("Brown-Reed"), the Healthcare Administrator, to downgrade Morse's performance review to say that she needed to show improvement in getting along with coworkers. *Id.* Brown-Reed refused, but speculated to Morse that Dr. Mitchell would probably "do the dirty work." *Id.* On Morse's final performance review for 2009, Brown-Read made a note that says: "Advised by Warden Osborne to talk to peers that state Ms. Morse does not promote a cordial work climate--does not promote harmony needs improvement in this area." Pl.'s L.R. 56.1 Stat. at ¶ 25.

## B. Morse's suspension

The events that led to Morse's suspension from IDOC started on August 23, 2011 when she overheard Dr. Brooks tell a desk sergeant that IDOC had authorized Wexford to hire two new dental assistants to work at Stateville and the NRC. *Id*. at ¶ 19.[1] About five days after Morse overheard Dr. Brooks make that comment, Wexford hired Alicia Shivers, a woman in her twenties, as a dental assistant. *Id*. at ¶ 80.

On August 29, 2011, Morse submitted an Incident Report in which she alleged that Ralph Portwood ("Portwood"), the president of her union, has "joined forces" with IDOC management at Stateville and failed to protect her from "harassment, discrimination and disparate [sic] of treatment." *Id*. at ¶ 28 (quoting Pl.'s Dep. Ex. 13). Morse then made broad allegations about the extent to which IDOC was mistreating her:

> He [Portwood] also failed to protect me from fraudulent investigation, black balling, phone tapping, identity theft, fraudulent signor and access to my home and property, socery [sic], disparate of [sic] treatment, humiliation, and try to terminate my state job and hire two Wexford [dental assistants].

*Id*. (quoting Pl.'s Dep. Ex. 13).

---

[1] Morse filed a complaint against Dr. Brooks in December 2009 alleging that he called her "stupid" and "lazy." *Id*. at ¶ 22. The Office of Affirmative Action characterized Morse's complaint as a standard of conduct issue having nothing to do with discrimination and referred it to Warden Hardy for resolution. *Id*. Wexford eventually terminated Dr. Brooks for engaging in unprofessional behavior. *Id*.

On the same day that Morse filed the Incident Report described above, she submitted a grievance making the same allegations. *See* Pl.'s Dep. Ex. 15. Morse also argued that the purported resolution of her October 2009 grievance about Dr. Mitchell's ageist comment was a "cover up." *Id.* Morse complained that IDOC never took corrective action and had left the issue unresolved. *Id.* According to Morse, she continued to be a victim of discrimination and harassment and was about to be fired. *Id.*

Two days later, on August 31, 2009, Morse filed an Incident Report with the OAA in which she referenced her ten previously filed grievances--including her age discrimination complaint against Dr. Mitchell--and said that nothing had been resolved. Pl.'s L.R. 56.1 Resp. at ¶ 30 (citing Pl.'s Dep. Ex. 14). Morse claimed that IDOC was "in the process of terminating [her] and [had] already hired two Wexford dental assistants to replace [her]." Pl.'s Dep. Ex. 14.

The OAA did not respond to Morse's complaint for almost three weeks. On September 19, 2011, Vickie Fair ("Fair"), the OAA's Administrator, advised Warden Hardy that Morse had filed a complaint alleging harassment and a plot to fire her. *See* Warden Hardy Dep. Ex. 6. Fair told Warden Hardy that the OAA would be sending a letter to Morse explaining that her complaint did not fall within that office's jurisdiction. *Id.* Warden

Hardy responded that he was "not at all sure where [Morse] is coming from" and asked Fair to "direct here [sic] back to the facility." *Id.* Fair replied that "the jest [sic] of [Morse's] complaint is her fear of termination to hire a Wexford employee." *Id.* Fair also sent Warden Hardy a copy of OAA's letter to Morse declining jurisdiction over her complaint. Warden Hardy then instructed Assistant Warden Keane to "[h]ave a talk with [Morse] about Chain of Command and proper protocol. Advise me when complete." *Id.*

There is evidence in the record suggesting that Warden Hardy knew perfectly well why Morse was worried about losing her job. According to Morse, Warden Hardy relayed messages to her through Dr. Mitchell and Dr. Brooks stating that IDOC could hire two Wexford dental assistants for the cost of Morse's state salary. Pl.'s L.R. 56.1 Resp. at ¶ 34. Morse heard from Dr. Mitchell that Warden Hardy had said: "[S]he's been here all these years, and we got some dental assistants, young dental assistants that we could bring in that we could give them Wexford jobs and eliminate her state job and pay them half." Pl.'s Dep. at 18. Warden Hardy allegedly authorized Dr. Brooks, a Wexford dentist, to start looking for Morse's replacement. *Id.* During Morse's last week of active employment at Stateville, Warden Hardy sent a correctional officer to tell

Morse he was going to get rid of her no matter how hard she was working.  *Id*. at 22.

Pursuant to Warden Hardy's instructions, Assistant Warden Keane summoned Morse to his office on September 20, 2011 around 8:45 am to discuss her complaints.  Pl.'s L.R. 56.1 Resp. at ¶ 39.  Morse explained that Dr. Mitchell had been harassing her for years and was trying to replace Morse with a younger employee.  *Id*. at ¶ 42; *see also* Dkt. No. 60 ("Def.'s L.R. 56.1 Resp.") at ¶ 12.  Morse also complained to Keane that Assistant Warden Osborne--who had transferred to a different IDOC facility--was still harassing her.  Keane testified that Morse's eyes were darting back and forth while she talked about Osborne tapping her phone and hacking into her bank account.  Pl.'s L.R. 56.1 Resp. at ¶ 43.

After Morse left Assistant Warden Keane's office and returned to the dental clinic, Dr. Brooks warned her to never have a discussion about him with IDOC management again.  *See* Pl.'s Dep. at 31.  Morse immediately reported Dr. Brooks's threat to Keane, who instructed her to file a written complaint.  *Id*.  Morse did so and submitted the complaint around 2:45 pm.  *Id*. at Ex. 16.

Meanwhile, Keane prepared an Incident Report summarizing his meeting with Morse and gave it to Warden Hardy.  Pl.'s L.R. 56.1 Resp. at ¶ 46.  Keane's report does not mention Morse's

complaint that Dr. Mitchell was trying to replace her with a younger employee. Instead, Keane focused on Morse's statement that Dr. Mitchell had established a "regime" of IDOC employees who were plotting to fire her, had tapped her phones and hacked into her bank account, and wanted her to lose her home. Keane Dep. Ex. 7. Towards the end of his report, Keane notes that he called the Healthcare Unit to inquire about "any recent issues with Ms. Morse's performance, conduct, or attitude." *Id*. "All staff stated that Ms. Morse comes to work, completes her tasks, and is always pleasant to deal with on a daily basis." *Id*.

During a follow up conversation with Warden Hardy, Keane opined that Morse's statements "were not based in reality" and expressed concern about her. Keane Dep. at 67. With that said, Keane did not consider Morse to be a threat to herself or others. *Id*. at 96-97. He thought Morse was simply reaching out for help. *Id*. at 64. After speaking with Warden Hardy, Keane contacted the Personal Support Services coordinator at Stateville to discuss referring her for counseling. Keane Dep. Ex. 7. He also contacted Dr. Wendy Blank ("Dr. Blank"), Chief of Mental Health, to discuss referring Morse for a psychological fitness for duty evaluation. *Id*.

Around 3:30 pm on September 20--about seven hours after Keane's meeting with Morse--he gave her a memorandum encouraging her to contact Personal Support Services. Pl.'s L.R. 56.1 Resp.

at ¶ 49.[2]  Morse refused the counseling referral, denied that she was having personal problems, and characterized the counseling referral as IDOC's way to set her up for failure.  *Id.* at ¶ 50. She also complained to Keane that Warden Hardy was having IDOC employees follow her around the facility and on her way home. *Id.*

Keane informed Warden Hardy that Morse had rejected the referral for counseling services and maintained that IDOC management was out to get her.  *Id.* at ¶ 51.  Warden Hardy says that he was concerned about Morse's mental stability and her ability to work at a penal institution.  *Id.* at ¶ 60.  After consulting with IDOC's Legal Department, Labor Department, and Dr. Blank, Warden Hardy decided to place Morse on paid administrative leave.  *Id.* at ¶ 59.

The memorandum that Warden Hardy hand-delivered to Morse on September 21 stated:

> Due to recent communication and action, you are required to have a fitness for duty assessment performed.  In order to come back to your work duties at Stateville C.C., you are required to produce a note from a qualified mental health professional stating that a mental health fitness for duty assessment has occurred.  This assessment is required prior to your return to duty.

---

[2] Keane's memo to Morse stated: "The information you provided was serious in nature and your reaction to the situation will be respected.  In my efforts to make the situation better for you, I would like to take a moment and have you reach out the [sic] a program designed to assist IDOC employees that find themselves in a situation."  Pl.'s Dep. Ex. 7.

Pl.'s Dep. at Ex. 5.[3]  During her leave, Morse was also required
to call her supervisor during the first hour of her normal shift
and make herself available by phone during her entire shift.
*Id*. at Ex. 4.

Morse asked Warden Hardy why he was placing her on leave
and ordering a psychological fitness evaluation.  He did not
answer Morse's question directly, but said, "You went to Vickie
Fair on me," referring to her August 31 incident report.  Pl.'s
Dep. at 24.

On September 21, 2011, immediately after Morse was placed
on administrative leave, she submitted a handwritten complaint
to the Office of Affirmative Action alleging that her superiors
had retaliated against her: "[T]oday I was lock [sic] out of the
prison on administrative leave of absence because I brought my
harassment paperwork to your office, and wrote the 434 on Dr.
Brooks."  Pl.'s Dep. at Ex. 17.  When Morse protested to Warden
Hardy that she was fit for duty and performed good work, "he
brought up me going to your office with my paperwork.  He
mentioned the problem with Dr. Mitchell.  It's basically
retaliation."  *Id*.

_____

[3] IDOC's policy regarding fitness for duty exams states: "A
referral for examination shall be made only when facts and
circumstances raise a serious question as to whether an employee
is able to effectively perform his or her job duties.  This
shall include, when applicable, the ability to respond to
unusual incidents."  Wysocki Dep. Ex. 3.

On October 5, 2011, the OAA advised Morse that it was reviewing her retaliation complaint and would notify her if IDOC opened an official investigation. Pl.'s Dep. at Ex. 10. Unbeknownst to Morse, the OAA conducted a preliminary investigation, which included interviews with Warden Hardy, Assistant Warden Keane, and Dr. Blank. *See* Wysocki Dep. Ex. 24. Based on these interviews, OAA concluded that Morse's "odd" and "erratic" behavior was "the legitimate motive" for placing her on administrative leave. *Id.* On December 23, 2011, the OAA told Morse that no official investigation into her allegations would be conducted. *See* Morse Dep. Ex. 11.

### C. Morse's efforts to return to work

On September 27, 2011, Warden Hardy sent a letter to Dr. Edward Tuder ("Dr. Tuder"), a psychiatrist, referring Morse for a "fit for duty evaluation." Wysocki Dep. Ex. 18. Warden Hardy enclosed a job description for the dental assistant position and identified IDOC's "major concern" as whether Morse "is stable in her thinking as well as her functional ability." *Id.* In the event that Dr. Tuder found Morse unfit for work, Warden Hardy asked him to estimate the length of her disability. *Id.*

On October 18, 2011, Dr. Tuder examined Morse, completed his report about her psychological fitness for duty, and sent the report to IDOC administrators. *See* Wysocki Dep. Ex. 21. In the paragraph summarizing his key findings, Dr. Tuder wrote:

[Morse] denied any hallucination, delusion, or paranoia, although paranoid thinking was evident. Here again she referred to the union contract having been violated and the problem with communication. Proverb interpretation was healthfully abstract. Judgment responses showed no impetuous potential. She could recall seven digits forward, five in reverse, and two of three cities. Her affect was essentially cheerful, but could abruptly shift to being defensive and guarded. She was loquacious, tangential, and showed evidence of distrust. Asked if she had ever had any other counseling of a psychological nature, she could not recall.

Based on a reasonable degree of medical certainty I would opine that she is not fit for duty. I would estimate a period of disability of two to three months' duration.

*Id*. Warden Hardy testified that IDOC should have asked Dr. Tuder to specify a date on which Morse would be cleared to return to work, but there is no evidence that IDOC made such an inquiry. Pl.'s L.R. 56.1 Resp. at ¶ 64.

On November 7, 2011, IDOC advised Morse of Dr. Tuder's findings and her right under the collective bargaining agreement "to seek an opinion from your own attending physician." Pl.'s Dep. Ex. 6.[4] IDOC also warned Morse that her paid leave was going to expire on November 16, 2011 and instructed her to tell the Personnel Office whether she wanted to use accrued sick time

---

[4] The relevant CBA provision states: "[W]hen the Employer has reason to suspect that an employee is not fit for duty and has requested a fitness for duty evaluation which determines the employee is unfit for duty and the employee's physician certifies the employee is fit for duty, the Employer may rely upon the decision of the impartial physician as to the employee's fitness for duty." Keane Dep. Ex. 12.

or request an unpaid medical leave. *Id*. If Morse refused to choose between these options by November 16, IDOD said it would have "no alternative but to proceed with a disciplinary case based on your inability to perform the duties of your position at this time." *Id*.

On November 17, 2011, ten days after IDOC advised Morse of Dr. Tuder's findings and the expiration of her paid leave, Morse called Diana Wysocki. Pl.'s Resp. to Def.'s L.R. 56.1 Stat. at ¶ 66. Morse opted to go on a medical leave of absence. *Id*. at ¶ 67. Wysocki forwarded Morse's request to payroll, but noted that Morse's accrued sick time should be exhausted before placing her on an unpaid medical leave. *See* Wysocki Dep. Ex. 9. Morse exhausted her sick time on December 14, 2011. Pl's L.R. 56.1 Resp. at ¶ 67. IDOC did not fill Morse's position during her leave; other dental assistants simply absorbed her work. *Id*. at ¶ 69.

On November 22, 2011, Morse submitted a report from her primary care physician, Dr. Byas, stating that she had "no emotional/psychological issues." *Id*. at ¶ 70. IDOC has taken the position during this litigation that Morse needed to submit a report from a mental health professional, but Warden Hardy's letter to Morse on November 7 expressly stated that she would see her "own attending physician." *Id*.

13

Two full months passed before IDOC told Morse on January 23, 2012 that she needed to attend a third fitness for duty exam with Dr. Ronald Wuest ("Dr. Wuest"). Pl.'s Dep. Ex. 6. IDOC's letter to Morse did not explain why a third examination was necessary, particularly in light of Dr. Tuder's opinion that her disability would last only two to three months and Dr. Byus's opinion that Morse was fit to work. Nevertheless, IDOC again warned Morse that failure to attend her appointment with Dr. Wuest could result in discipline. *Id*.

More believes IDOC's attempt to send her to Dr. Wuest was pretextual because he was never registered as a state vendor. Pl.'s L.R. 56.1 Resp. at ¶ 72. In any event, Morse told IDOC on January 23, 2012 that she was unwilling to attend a third fitness for duty examination. *Id*. at ¶ 74. IDOC contacted Portwood, the union president, who also reached out to Morse. *Id*. Morse told Portwood that she would not attend the appointment with Dr. Wuest because God told her not to go. *Id*. at ¶ 75. Morse also maintained that a third opinion was unnecessary because Dr. Byus had cleared her to return to work on November 22, 2011. *Id*. at ¶ 76.

### D. Morse's EEOC charge and resignation

On June 5, 2012, Morse filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging that IDOC had forced her into a "work fitness program" because of her age

14

and retaliated against her for complaining about age discrimination. Pl.'s Dep. Ex. 2. The EEOC issued Morse a right to sue letter on September 21, 2012 without making any findings about her allegations. *Id*.

About one year after filing her EEOC charge, Morse resigned from her position as a dental assistant. Pl.'s Dep. Ex. 8. When asked at her deposition why she resigned, Morse explained:

> Because my doctor said I could come back to work. They were not honoring that. Diane [Wysocki] told me she was trying to help me, because they were trying to fire me. And when I was trying to find attorneys, the attorneys said the state was trying to fire me. So if somebody cuts your income off, it's better to retire than work 21 and a half years and get nothing.
>
> And they told you that all year long, and the warden was telling me, "We're going to get rid of you. We can get two for your salary." And they acted on it by hiring Alicia [Shivers], and locked me out and send [sic] me to the psychiatrist, so why would I lose my pension?

Pl.'s Dep. at 56-57 (line break added).

In her complaint, Morse claims that IDOC discriminated against her because of her age when it placed her on administrative leave and blocked her from returning to work (Count I). She also alleges that IDOC took these actions in retaliation for her complaints about age discrimination (Count II).

## II. Analysis

IDOC has moved for summary judgment on Morse's discrimination and retaliation claims. Summary judgment is appropriate only if no reasonable jury could return a verdict for Morse even after viewing the evidence in her favor. *See Liberty Lobby*, 477 U.S. at 248.

### A. Discrimination claim

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The statute's protections are limited "to individuals who are at least 40 years of age." *Id.* at § 631(a).

In order to prevail on her age discrimination claim, Morse "must show that [s]he is a member of a class protected by the statute, that [s]he has been the subject of some form of adverse employment action...and that [IDOC] took this adverse action on account of [Morse's] membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). The parties agree that Morse is a member of the ADEA's protected age group, but they disagree on two issues: (1) whether IDOC took any adverse actions against Morse and, if so, (2) whether Morse can show that she suffered those adverse actions because of her age.

## 1. Adverse action

"The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000); *see also Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005) (explaining that "adverse action" requirement is a "judicial gloss" on the statutory term "discrimination").

"Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011).

Morse argues that IDOC's decision to place her on administrative leave in September 2011 and its refusal to allow her to return to work constitute adverse employment actions. IDOC counters that *Nichols v. Southern Illinois University, Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2007), stands for the proposition that an employee on paid leave pending the

17

results of a psychological fitness evaluation has not suffered an adverse action. *See also Lee v. Northwestern Univ.*, No. 10 C 1157, 2012 WL 1899329, at *8 (N.D. Ill. May 24, 2012) (Kocoras, J.) (same). *Nichols* and *Lee* are retaliation cases--as opposed to standard discrimination claims--but the courts of appeals are in agreement that "a suspension with pay, 'without more,' is not an adverse employment action under the substantive provision of Title VII [or the ADEA]." *See Jones v. SE Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)).

The flaw in IDOC's no adverse action argument is that Morse was not simply suspended with pay pending the results of a psychological fitness evaluation. She received pay for only six weeks, after which IDOC depleted her sick leave and then placed her on unpaid leave until she resigned. In contrast, Nichols was on paid leave for about three months before his employer reinstated him with no apparent interruption in pay. *See Nichols*, 510 F.3d at 786; *see also Lee*, 2012 WL 1899329, at *3 (noting that employee "continued to receive his salary" while on leave before Northwestern fired him). Morse is more like the employee in *Jones*, whose paid leave turned into a suspension without pay that eventually resulted in termination. 796 F.3d at 327 (drawing a distinction for purposes of the "adverse action" requirement between an initial paid suspension and an

ongoing suspension without pay that leads to termination).  An

unpaid suspension clearly constitutes an adverse action.  *See*

*Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005);

*see also Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704

(7th Cir. 2012).  Therefore, I find as a matter of law that

Morse suffered an adverse employment action for all but the

first six weeks of her leave.  *See Lewis v. City of Chicago*

*Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009) (observing that

"courts should not generally task juries with determining

whether terminations, demotions or salary cuts are materially

adverse actions").

## 2. Because of age

"[A] plaintiff bringing a disparate-treatment claim

pursuant to the ADEA must prove, by a preponderance of the

evidence, that age was the 'but-for' cause of the challenged

adverse employment action."  *Gross v. FBL Fin. Servs., Inc.*, 557

U.S. 167, 180 (2009).  Morse can make this showing using either

the direct or indirect method of proof, both of which drive at

the same question: whether she has "produce[d] enough evidence,

whether direct or circumstantial, to permit the trier of fact to

find that [IDOC] took an adverse action against [Morse] because

of his [age]."  *Morgan*, 724 F.3d at 997.

I start with the direct method, which the Seventh Circuit

has endorsed as "the default rule" in employment discrimination

cases.  *Id*.  "'Direct' proof includes both evidence explicitly
linking an adverse employment action to an employer's
discriminatory animus and circumstantial evidence that would
permit the trier of fact to infer that discrimination motivated
the adverse action."  *Id*. at 995 (internal citations omitted).

Morse has presented direct evidence that her age was a "but
for" cause of IDOC's decision to place her on leave and block
her from returning to work.  IDOC's key decision-maker, Warden
Hardy, was aware of Morse's complaint in October 2009 that Dr.
Mitchell had called her "old and slow" and praised another
dental assistant as "younger and faster."  A jury could find
that Warden Hardy agreed with this critique, as evidenced by his
complaint to Dr. Mitchell that Morse "has been here all these
years, and we got some dental assistants, *young* dental
assistants that we could bring in that we could give them
Wexford jobs and eliminate her state job and pay them half."
Pl.'s Dep. at 18 (emphasis added).  Warden Hardy then started
warning Morse, through Dr. Mitchell, that he could hire two
Wexford dental assistants for the cost of her state salary.
Pl.'s L.R. 56.1 Resp. at ¶ 34.  Only five days after Morse
overheard Dr. Brooks boasting about the plan to replace her,
Wexford hired Alicia Shivers, a dental assistant in her
twenties.  *Id*. at ¶¶ 19, 80.  Warden Hardy delivered a final
warning to Morse during her last week of employment before he

had received any negative reports about her psychological fitness: IDOC was going to get rid of Morse no matter how hard she worked.  Pl.'s Dep. at 22.

Accepting Morse's side of the story as true--as I must at this stage--a jury could reasonably find that IDOC plotted to get rid of Morse because of her age and used the psychological evaluation as a fortuitous pretext for placing her on a leave from which she would not return.  Warden Hardy expressed a desire to replace Morse with younger dental assistants, not simply lower paid ones. *Cf. Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125-26 (7th Cir. 1994) (discharge of workers based on salary considerations not necessarily discriminatory even though salary and age are often correlated). I cannot dismiss Warden Hardy's use of the term "younger" as a casual slip of the tongue.  The combination of Warden Hardy's age conscious remarks and his stated determination to get rid of Morse before any concerns arose about her psychological health are enough for a jury to infer that age was a "but for" cause of her downfall at IDOC.

### B. Retaliation claim

Morse's second claim is that IDOC retaliated against her for complaining about age discrimination.

The ADEA makes it "unlawful for an employer to discriminate against any of his employees...because such individual...has

21

opposed any practice made unlawful by this section[.]"  29
U.S.C. § 623(d).  The direct method of proof for ADEA
retaliation claims requires Morse to show that: "(1) she engaged
in statutorily protected activity; (2) she suffered an adverse
employment action; and (3) there is a causal connection between
the two."  *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655,
657 (7th Cir. 2012).  IDOC contends that Morse's retaliation
claims fails all three prongs of the direct method.

## 1. Protected activity

"In order for [Morse's] complaints to constitute protected
activity, they must include an objection to discrimination on
the basis of age."  *Id.* at 658; *see also Magyar v. St. Joseph
Regional Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008) (employee
must complain about a form of statutorily prohibited conduct,
but need not prove that conduct she perceived as unlawful
actually violated statute).  "Merely complaining in general
terms of discrimination or harassment, without indicating a
connection to a protected class or providing facts sufficient to
create that inference, is insufficient."  *Tomanovich v. City of
Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Morse made her first complaint about age discrimination in
October 2009 when she filed a grievance accusing Dr. Mitchell of
calling her "old and slow."  The issue of age discrimination
resurfaced in August 2011 when Morse overheard Dr. Brooks say he

was plotting to fire her.  Morose immediately filed a grievance alleging that the purported resolution of her October 2009 grievance about Dr. Mitchell's ageist comment was a "cover up." Pl.'s Dep. Ex. 15.  Morse complained that the underlying issue had never been resolved.  *Id.*  Two days later, on August 31, 2011, Morse filed an incident report with the OAA in which she referenced the administrative number assigned to her October 2009 grievance about Dr. Mitchell's "old and slow" comment along with nine other previously filed grievances.  Pl.'s Dep. Ex. 14. Morse told the OAA she was now being subjected to even more severe "harassment," including a plot to replace her with two Wexford dental assistants.  *Id.*

To the extent Morse's references to age discrimination in August 2011 were oblique--which would not be fatal to her retaliation claim, *see Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011)--she made her complaint explicit during her September 20 meeting with Assistant Warden Keane. Morse told Keane that Dr. Mitchell was trying to get rid of her and replace her with a younger employee.  Def.'s L.R. 56.1 Resp. at ¶ 12.

On these facts, a reasonable jury could find that Morse engaged in statutorily protected activity before IDOC placed her on administrative leave.  IDOC draws a strained analogy to *Smith*, where the Seventh Circuit held that a bank employee had

not engaged in statutorily protected activity when she (1) "inquir[ed] about the formula used to calculate a contribution to her pension plan"; (2) "complain[ed] about cutbacks to her branch staff"; and (3) "complain[ed] regarding issues with her 401(k) contributions." 674 F.3d at 658. Smith's retaliation claim failed because none of her complaints included an objection to discrimination based on age. *Id*. In contrast, Morse's has presented evidence that she first complained about age discrimination in October 2009; informed IDOC in August 2011 that the underlying issue had not been resolved; and explicitly told Assistant Warden Keane on September 20, 2011 that her supervisor, who had criticized her as "old and slow," was trying to replace her with a younger worker. Morse's explicit complaints about age discrimination distinguish her from Smith and could lead a reasonable jury to find that she engaged in protected activity.

## 2. Adverse action

With regard to the second prong of an ADEA retaliation claim, IDOC argues that no reasonable jury could find that Morse suffered an adverse employment action when she was placed on administrative leave pending a psychological fitness evaluation.

IDOC erroneously assumes that an "adverse action" means the same thing for purposes of discrimination and retaliation claims. The ADEA's anti-retaliation provision, unlike its

substantive prohibition against discrimination, "is not limited
to discriminatory actions that affect the terms and
conditions of employment." *Burlington Northern & Santa Fe Ry.
Co. v. White*, 548 U.S. 53, 64 (2006).[5] A materially adverse
action in the retaliation context is one that "might have
dissuaded a reasonable worker from making or supporting a charge
of discrimination" had she known beforehand how her employer
would respond. *Id*. at 68 (internal quotation omitted). The
Supreme Court intentionally "phrase[d] the standard in general
terms because the significance of any given act
of retaliation will often depend upon the particular
circumstances." *Id*. at 69. "[A]n 'act that would be immaterial
in some situations is material in others.'" *Id*. (quoting
*Washington*, 420 F.3d at 661). "Title VII's anti-retaliation
provision [like its counterpart in the ADEA] is simply not
reducible to a comprehensive set of clear rules." *Thompson v.
N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011).

IDOC appears to believe that its actions could not have
deterred a reasonable employee in Morse's position from
complaining about age discrimination because she received a

---

[5] The ADEA's anti-retaliation is "materially indistinguishable"
from the parallel provision in Title VII that the Supreme Court
interpreted in *White*. *See Gomez-Perez v. Potter*, 553 U.S. 474,
495 (2008) (Roberts, C.J., dissenting); *see also Barton v.
Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011) (applying *White*
standard to ADEA retaliation claim).

paycheck during the first six weeks of her leave. *See Nichols*, 510 F.3d at 787 (holding that placement of employee on paid leave pending a psychological fitness evaluation was not a materially adverse action for purposes of retaliation claim). At the summary judgment stage, I cannot accept IDOC's invitation to focus narrowly on the first six weeks of Morse's leave during which she received a regular paycheck. It is not as if Morse received pay for six weeks before IDOC reinstated her. To the contrary, IDOC gave Morse only six weeks to pass a mental fitness for duty examination before she was forced to use accrued sick time and then accept unpaid leave--both of which qualify as adverse actions in the retaliation context. *See Burlington*, 548 U.S. at 73 (an indefinite suspension without pay might deter a reasonable employee from engaging in protected activity); *see also Washington*, 420 F.3d at 662 (forcing an employee to use vacation or sick leave is "an effective reduction in salary" that might deter the employee from complaining about discrimination).

On these facts, a jury could find that a reasonable employee in Morse's position might have been deterred from complaining about age discrimination had she known that IDOC would give her only six weeks to pass a mental fitness for duty examination (subject to ill-defined standards) before depleting her sick time and placing her on an indefinite, unpaid leave of

absence. *See Ransom v. Levy Security Corp.*, No. 11 C 7979, 2013

WL 3013652, at *1 (N.D. Ill. June 17, 2013) (Kennelly, J.)

(denying motion for summary judgment on retaliation claim

because jury could find that "a reasonable employee might be

dissuaded from complaining about discrimination by the threat of

being forced into a mental health evaluation as well as by what

amounts to an extended suspension without pay").

### 3. Causation

The final step of the direct method for avoiding summary

judgment on a retaliation claim requires Morse to present

evidence that her protected activity was a "but for" cause of

the adverse action she suffered. *See Univ. of Tex. SW Med. Ctr.

v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (adopting "but for"

causation standard for Title VII retaliation claims); *see also

Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011)

(applying "but for" causation standard to ADEA retaliation

claims).

"The causal nexus referenced by the third element may be

shown through direct evidence, which would entail something akin

to an admission by the employer ('I'm firing you because you had

the nerve to accuse me of sex discrimination!'), or through a

convincing mosaic of circumstantial evidence that would permit

the same inference without the employer's admission." *O'Leary*

*v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (internal citations and quotation omitted).

When Morse asked Warden Hardy why he had placed on her on administrative leave pending a psychological fitness evaluation, he said, "You went to Vickie Fair on me," referring to the incident report Morse filed with the OAA on August 31 in which she referenced her prior complaint about Dr. Mitchell's "old and slow" comment. Warden Hardy's response is direct evidence of a causal connection between Morse's protected activity and IDOC's decision to suspend her until she passed a psychological fitness evaluation.

A reasonable jury could also find that the suspiciously close timing between Morse's explicit complaint about age discrimination during her meeting with Assistant Warden Keane on September 20 and IDOC's decision to suspend her a few hours later supports an inference of causation between the two events. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (jury could reasonably infer causation where adverse action occurred one day after employee engaged in protected activity).

In sum, there is ample evidence from which a jury could reasonably infer a causal connection between Morse's protected activities and the adverse actions IDOC took against her.

## C. IDOC's defense

IDOC argues strenuously that it had a non-discriminatory reason for ordering Morse to pass a psychological fitness evaluation--namely, Warden Hardy's and Assistant Warden Keane's concerns about whether she was mentally stable enough to work at Stateville prison. Morse counters that the psychological fitness evaluation was a pretext for discrimination and retaliation, as evidenced by IDOC's refusal to allow her to return to work even after Dr. Byas reported in November 2011 that she had "no emotional/psychological issues." Pl.'s L.R. 56.1 Resp. at ¶ 70

I have analyzed Morse's discrimination and retaliation claims using the direct method of proof, under which "plaintiffs are not required to rebut a defendant's non-discriminatory reason for the adverse employment action, as they must under the indirect method." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 588 (7th Cir. 2011). IDOC may argue to a jury that it placed Morse on leave and refused to let her return to work for non-discriminatory reasons, but that argument "is insufficient to quash [her claims] at summary judgment." *Id.*

## III. Conclusion

IDOC's motion for summary judgment is DENIED for the reasons stated above.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: October 16, 2015